Filed 12/11/20  In re Elizabeth B. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re ELIZABETH B. et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B304015<br>(Los Angeles County<br> Super. Ct. No. 19CCJP04874A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>MARSHA B.,<br><br>      Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Sabina A. Helton, Judge.  Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

Appellant Marsha B. (mother) appeals from juvenile court findings as to four of her five children, Elizabeth (age 15), Howard (age 13), Vanessa (age 11), and Isaac (age 10).[1] The court found the children were at risk because mother regularly subjected them to inappropriate physical discipline, and her conduct after learning that the children's father (who is not a party to this appeal), sexually abused Elizabeth placed all the children at risk of similar abuse. Mother argues the record contains insufficient evidence to support the juvenile court's findings that the children were at risk by virtue of her physical abuse or father's sexual abuse of Elizabeth. Also, she insists the court abused its discretion by requiring her to participate in sexual abuse awareness counseling. Neither contention has merit. We conclude that substantial evidence supports the juvenile court's findings and orders and affirm.

## BACKGROUND

Consistent with our standard of review, we state the record in the light most favorable to the juvenile court's findings and indulge all legitimate and reasonable inferences to uphold the challenged rulings. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*); *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384 (*Kadence P.*) ["We review the juvenile court's jurisdiction findings and disposition order for substantial evidence"].)

---

[1] Mother's youngest and fifth child, Ethan, is not one of father's children, nor is he a subject of this appeal.

The family came to the attention of respondent Department of Children and Family Services (DCFS) most recently in early May 2019 after it was reported that mother engaged in physical and emotional abuse against Isaac. Howard heard the heated argument between his mother and brother and intervened after seeing mother hit Isaac repeatedly with an open and a closed hand on his chest, arm and torso.

A DCFS social worker met with the children in mid-May 2019. Vanessa told a DCFS social worker that mother was frequently angry and yelled and had sometimes hit her with a belt, most recently five years earlier. Vanessa did not like living with mother but was not afraid of her. Neither Vanessa or Elizabeth witnessed the incident between mother and Isaac, but they did hear shouting, arguing, and mother cursing at Isaac. Elizabeth told DCFS that mother spanked the children with an open hand and hit them with belts on the butt over their clothes, most recently in her case in 2017. Elizabeth was not afraid of mother but did not "trust" her and wanted to live with a relative. She informed the social worker that father had sexually abused her.

Isaac said he and mother argued, after which she spanked him about 15 times on the butt with an open hand over his clothes, and Howard intervened and pushed mother away from Isaac while she cursed at him. Isaac said he was afraid of mother who "hit [him] with the belt," and might do so again. He also said he was primarily "afraid when [mother got] really mad because she gets crazy and starts yelling." Isaac was seeing a therapist. Mother had attended some of

his therapy sessions, but "[didn't] listen," and the counselor had "to tell her to stop talking." Isaac's therapist confirmed she had tried to include mother in Isaac's sessions, but the two triggered one another and were unable to communicate calmly. The therapist said Isaac harbored a great deal of anger toward mother.

Regarding the incident between mother and Isaac, Howard told DCFS he heard mother yell and heard Isaac crying. Howard entered the room, saw mother "smacking" Isaac on his "back and side" with a half-closed hand and pushed her away from Isaac. Howard yelled at mother, who also tried to spank him although he moved, and she hit his stomach. Howard was bruised where mother had hit him. Isaac's arm bore scratches from mother's nails and he had a big bruise on his stomach. Howard said mother regularly hit and scratched the children and left them bruised. She did this "when she [felt] like it," about "11 times a month." Howard was not afraid of mother but did not want to live with her. He preferred to live with father but, if that was not possible, would go into foster care. Howard's therapist said the child had disclosed mother's physical abuse in the past. The therapist, however, was more concerned about mother's emotional abuse. Mother appeared "distraught" and "frustrated," but also unaware of how Howard and his siblings felt. None of Elizabeth's siblings believed father had sexually abused her.

Regarding the incident with Isaac, mother explained that she had grabbed headphones from Isaac's hand after the two argued, and he tried to punch her. She spanked him once on the butt with an open

4

hand over his clothing, at which point Howard came into the room and threatened to call the police. Mother denied hitting Howard or cursing at her children. As for father's sexual abuse, mother said Elizabeth had disclosed in January 2019 that father had sexually abused her for several years. The case was investigated by the District Attorney—who declined to prosecute—and the Riverside child welfare agency. Records from that agency showed the child welfare investigation was closed after the agency concluded the children were safe with mother, who obtained a family law restraining order against father. Mother said she and father had divorced 10 years earlier but continued to experience problems. At first, the children had lived with father. Later, after Elizabeth expressed her fear of mother, and the Riverside agency conducted an investigation, mother agreed the four oldest children could live with father. In about 2015, the family lived together again for a while when the parents attempted to reconcile, but that had ended after mother discovered father soliciting sex online.

When interviewed in early June 2019, father told DCFS he had not known that mother physically abused the children. They told father only that mother yelled at them and got really upset. He denied sexually molesting Elizabeth. The parents agreed to participate in Voluntary Family Maintenance.

DCFS received a new referral after Elizabeth began acting out sexualized behavior. When interviewed, family members told DCFS the following: Howard described the family's current living situation as "not so good." Mother no longer hit the children, but he was unable to

5

move on from what she had done in the past. Vanessa said the situation varied but did not think anything would help. Isaac was "okay" with the current situation. He said mother was not hitting the children but did argue frequently with Elizabeth. Elizabeth reiterated her earlier claims that she did not like being around mother. She also reiterated that that father sexually abused her between the ages of 12 and 14.

In July, Mother told DCFS that all her children except Elizabeth (who wished to live with a paternal aunt), wanted to live with father. Mother expected the family law court to award him custody.[2] Also in July, Elizabeth's therapist told DCFS the child was suffering from the emotional and verbal abuse she had witnessed for years between her parents. All four children reported that mother still yelled at them but had not hit them since DCFS intervened in May. However, none of the children had been able to get along with her.

When interviewed by DCFS, mother blamed the children and/or father for everything, refused to focus on the idea of undergoing therapy, and took no personal accountability. DCFS began providing Wraparound services in mid-July. The facilitator of that program agreed that mother refused to take accountability and had to be convinced she needed services. All the children felt unsafe in mother's

---

[2]      In July 2019, Ethan's father told DCFS he had sought full custody because mother was unable to meet the needs of this autistic child and neglected and refused to feed him. Although mother had supervised visits with Ethan twice per month, she often failed to show up. Ethan's father warned the social worker that mother was not very truthful.

care. Elizabeth was afraid father would hurt her for revealing his sexual abuse. After learning her siblings might be detained from father, Elizabeth recanted her accusations of sexual abuse and said mother made her lie. The child's therapist clarified that Elizabeth now said father never "raped" her, but he had molested her since she was "little." Elizabeth said mother was exaggerating by referring to the molestation as "rape," and said she was tired of mother exaggerating and telling her to say things to get father in trouble.

DCFS records revealed the family had been the subject of four investigations in 2015 and 2016. In summer 2015, Elizabeth reported that father was physically abusing the children, and that mother did nothing after being told about it. The matter was closed after the children denied any abuse. Three referrals in 2016 involved allegations of physical abuse by mother. In a referral in April 2016 (later closed as unfounded), Elizabeth claimed mother hit her several times on her back with her hand and had hit her with father's work shoe. In December 2016, Elizabeth claimed that mother (and Elizabeth's maternal uncle) hit her on the back and arm. Elizabeth seemed fearful and appeared to be in emotional distress. In December 2016, Elizabeth reported that mother tried to punch Howard. Although father had stopped her, mother got upset again and hit Howard on the face with an open hand. She also used a belt to hit the children and threw things. None of the children had claimed to be injured and the allegations of physical abuse were deemed inconclusive. Mother had agreed to let the children live with father, and to participate in services to address parenting issues.

Regarding the allegations of father's sexual abuse of Elizabeth, a report from a November 2019 interview by Riverside police contained the child's statements that father began touching her inappropriately when she was in third grade and the family still lived together. The abuse got worse and progressed to sexual intercourse (a claim she later recanted) when she was in middle school. The most recent incident of sexual intercourse occurred in May or June 2018. Father continued touching Elizabeth inappropriately, but the child did not tell mother. Elizabeth had confided in a friend about the abuse, and eventually told her grandmother. Elizabeth told the Riverside police she believed mother "had clues" about the sexual abuse because she sometimes charged into the room when father was sexually abusing her "thinking something was going on." Mother told the police she noticed Elizabeth was shaving her pubic area at age 12 and said that, when the family had lived in Arcadia, father and Elizabeth slept together on an air mattress as often as four times a week.

On August 1, 2019, DCFS filed a section Welfare and Institutions Code section 300 petition.[3] At the detention hearing the following day Elizabeth's counsel told the court mother had not complied with the Wraparound services, and Elizabeth wanted to be detained from mother's care and placed with a paternal relative. The physical and emotional abuse created an unsafe environment for her, and Elizabeth was also afraid for her siblings' safety. At first, the court was reluctant to detain Elizabeth from mother while the relative assessment was

---

[3] Statutory references are to the Welfare and Institutions Code.

8

being done. Elizabeth told the judge she would rather go to foster care pending the relative placement. Elizabeth cried when the court asked if she could stay with mother while the assessment was conducted. She said she "really [didn't] want to," and told the judge she felt physically and emotionally unsafe. When the court indicated it would detain Elizabeth but release the other children to mother, counsel for the three younger children said her clients all felt the same as Elizabeth. They wanted to be placed with father, with whom they felt safer (or, alternatively, with a paternal relative), because mother was physically and verbally abusive.

After an off-record conference, the court stated, "Elizabeth is expressing to me very strongly that she feels unsafe in the home of mother and father. She is, actually, crying when I indicate I might return her to the home of mother. Based on that, the risk I find to Elizabeth, I think the same risk exists for the children." The court observed that the petition alleged physical abuse, which placed the younger children at risk. Mother refused to release the children to the care of a paternal relative to avoid an interim foster care placement. The court ordered all four children detained from both parents, who were given monitored visitation except for father, who was to have no visits with Elizabeth.

*Jurisdiction/Disposition Reports*

In documents prepared in advance of the December 30, 2019 adjudication hearing, DCFS noted that mother claimed that, during the

incident that gave rise to this action, she spanked Isaac's butt nonviolently with an open hand over his clothes after he came at her with his fists. She left no marks on the child. Howard came into the room during the incident and tried to hit mother. Mother told DCFS this had been the first time in over three years that she had spanked Isaac, and it had been as many as two years since she had spanked Howard or the girls. Mother acknowledged having once hit Elizabeth with a belt years earlier.

With regard to the sexual abuse, mother said that, after Elizabeth revealed it, mother contacted her attorney, the Riverside child welfare agency, and the police. Father was arrested and mother obtained a three-month restraining order. Mother denied the children's allegations that she had physically abused them but expressed a willingness to participate in services.

In early August 2019, the children told DCFS they did not want to visit mother or even speak to her. DCFS was concerned that mother had discussed this dependency case with the children and there was a question as to whether mother instructed Elizabeth to lie during a phone call. Elizabeth denied that she had.

Regarding the allegations of physical abuse, Elizabeth told a social worker that, except for the incident involving Isaac and Howard, mother had not hit the children since 2017. She did hit Elizabeth with a belt from the time the child was about four years old until the parents divorced in 2012. Elizabeth described the parents' attempt to reconcile in 2015 as a "horrible" time. Mother became "really physically abusive"

10

and neglectful, especially toward Ethan whom "[s]he slapped . . . a lot." In Elizabeth's opinion, her parents' misdeeds ranked at "the [same] level on what they've done." During her recent phone calls with mother, Elizabeth said mother devoted a great deal of time to talking about court and the calls ended on a bad note. Elizabeth did not believe mother had changed. As for the allegations of father's sexual abuse, Elizabeth said mother was more focused on having father punished, than on listening to or supporting Elizabeth.

In September 2019, Howard told DCFS the "[w]hen [he] was living with [mother], she was very abusive physically, emotionally, and verbally[, but primarily] physical. The last time was four to six months ago." In describing the incident involving Isaac, Howard said he saw mother "hitting [Isaac] hard and fast" with what "looked like a fist . . . on his waist and his back. She originally tried to spank him but then he got the fist." Mother hit Isaac at least "20 times" and Howard saw bruises on Isaac's waist and arm. Isaac was crying and Howard "shoved [mother] out of the way." Mother had tried to justify her behavior to Howard, saying she had a right to spank her children. Howard told DCFS that mother "always hit [her children]" with a belt or tried to spank them. The May 2019 incident with Isaac had been "the most major incident," but Howard had seen mother "hit Isaac before many times." Howard said that the "last time [mother hit him], she did hurt [him] a little bit. [He] had scratches and bruises on [his] arm. She [had tried] to grab [Howard]." He recalled that incident occurred about three months before the one involving Isaac. Howard expressed a preference

11

to live with father and denied his mother's claim that it was because father had more money and a more comfortable home.

Vanessa reported that sometime between the ages of four and seven years, mother had "hit [her] with the shoe or a belt or hit [her] with [a] hand on [her] butt" which left marks. Although Vanessa had not recently experienced mother's physical abuse, she said she "would rather stay in foster care than go with [mother]."

Isaac told DCFS that mother "was always yelling at" the children and hit them if they forgot to do something. A year or two earlier, mother had hit Isaac with a belt or shoe "every single day." She still hit him, but less frequently—"once a week or something like that"—using her hands on his back and butt. Her recent assaults had not risen "to the point of crying but [were] scary." With regard to the May 2019 incident, Isaac described his level of pain as "probably . . . a 9 or an 8.5 because it hurt super bad and [he] couldn't do anything. [Mother] had long nails. She was pulling [him] and scratched [his] skin. [He] was hurt." Howard rescued him. Isaac described mother's home as "horrible," and said it would be "horrible" to visit her.

Mother told DCFS that she believed Elizabeth's claim of sexual abuse and also believes Elizabeth "hates [her] because [she] wasn't there to protect her." Mother attended therapy in June of 2019 and had reached out to abuse organizations for help because she too had been the victim of violence by her mother. Father told DCFS that mother did "get carried away. She has a little bit of an anger thing." She hit the children with a belt or shoe, but he did not think she tried to cause then

12

physical harm.  He described mother as "pretty angry most of the time. Anything sets her off."

DCFS reported that mother and Elizabeth had two monitored visits as of October 2019.  The two appeared comfortable with each other and, during one visit, mother made an emotional apology for her mistakes.  The other children had refused all contact with mother but had unproblematic visits with father.  Mother participated in three individual counseling sessions in fall 2019 but lacked the funds to continue attending.  She attended nine parenting classes and a  class for foster parents of children with behavioral issues.  A report issued after the parenting classes noted mother "need[ed] to work on controlling her emotions and depression."  Both the Wraparound coordinator and a therapist told DCFS they believed mother had coached Elizabeth to disclose father's sex abuse and confused the child. DCFS also noted that previous aggressive behavior exhibited by Howard and Isaac had dissipated since their placement in foster care. The team believed mother "trigger[ed]" the boys' behavior and "pitted the siblings against each other."  The team members remained concerned about Elizabeth, who "display[ed] some of mother's behaviors," and were trying to obtain a psychological evaluation for the child.

In one meeting with the social worker, Elizabeth was distraught and said  information she had provided was not entirely true because mother asked her to "exaggerate."  The social worker opined that "Elizabeth appear[ed] to have been severely affected by mother's

coaching and the position she has been put into by having to choose sides. The child is extremely conflicted, confused, and distraught."

During a November 12, 2019 meeting with the social worker, mother had gotten increasingly angrier and seemed out of control. The social worker believed mother had difficulty managing her anger.

In late October 2019, the children were placed with a paternal aunt in Riverside. As of November 21, 2019, the three younger children still remained unwilling to visit mother. Joint counseling sessions between mother and Elizabeth had not yet begun. On November 22, 2019, mother attended Howard's school baseball game unannounced, unmonitored and without prior approval, and was confronted by Elizabeth and Howard. Both parents were banned from the school.

Elizabeth underwent a forensic interview in November 2019. The transcription of that interview reveals that Elizabeth said mother threw steel-toed boots at the children and punished them with belts, shoes, or "whatever she could grab." She described mother as "kind of abusive," "more aggressive" and frequently angry. She slapped the children to punish them, but also did so as a joke she could laugh about. Elizabeth believes mother is bipolar or has a problem managing anger.

Elizabeth told the interviewer that father began to "get[] touchy" with her again in 2015. He "groped" her in various areas, including her chest and butt, over and underneath her clothing. She could not recall how frequently father touched her between the ages of 10 to 14 but said the touching "disturbed [her]." After touching her, father would apologize, say "This isn't right and I'm going to get arrested and [tell

14

Elizabeth not to] talk about it." The abuse happened during the time the family was living together when the parents tried to reconcile and when they moved to her paternal grandparents' home. Elizabeth suffered "really bad nightmares" in fall 2018 and told two friends about father's abuse around that time. She still had flashbacks to and nightmares about father touching her. She said mother said "she had an idea" the abuse was happening. However, Elizabeth did not believe mother was being truthful because, "[i]f she had an idea, she would have told someone."

After learning about father's sexual abuse, mother tried to obtain custody of Elizabeth. Mother urged Elizabeth to exaggerate and claim father engaged in sexual intercourse with her so he would "get arrested for life." Elizabeth now said there had been no intercourse. Mother had told Elizabeth to report the abuse and she planned to "[d]o whatever to get [father] in jail." At mother's urging Elizabeth had related to the police an extreme version of father's conduct. Elizabeth later recanted that accusation and said father had "just touched [her] weird." Mother caused Elizabeth distress by "nagging and bugging" her about her desire to send father to jail.

Elizabeth revealed she was "suicidal" between 2015 and 2017 and had attempted suicide in the past. She had seen "no point" to living because she was living with mother who "punished [her] for whatever reason [mother] want[ed] it to be." Currently, Elizabeth was not contemplating suicide. Elizabeth was afraid to reveal her sexual

15

orientation to her parents, having observed her extended family's poor reaction after another relative had come out.

Despite the sexual abuse, Elizabeth preferred to live with father, and had "more flashbacks of being with [her] mom than ever being with" father. She "had a lot [of flashbacks] of [mother] . . . hitting [her] with the belt," and sometimes awoke "screaming." Elizabeth did not want to live with mother and explained the children were "taken away from her because she was abusive with [Ethan]" who had "marks all over him." Elizabeth said that her parents were neither the best nor the worst parents. She did not want to lose them, but also did not want to live with either one. Elizabeth preferred to stay in foster care but agreed to live with a paternal relative to please her siblings.

The adjudication hearing was conducted on December 30, 2019. DCFS recommended the court sustain the count regarding father's sex abuse only under section 300, subdivision (b), and father pled no contest to an amended count against him. The attorneys representing the children, father's counsel and DCFS all urged the court to sustain the allegations against mother, whose counsel argued the charges should be dismissed. The court sustained the allegations against mother. It observed that during the detention hearing, each of the children was "shaking and crying and saying they did not want to go with the mother." The court believed that the children's extreme reaction reflected their "very real fear" about remaining in mother's care. The judge noted she had never before seen such strong a reaction during her

16

tenure in dependency court. The court sustained an amended petition and dismissed two counts.[4]

Proceeding to disposition, mother's counsel noted mother did not seek to have the children placed in her care. However, mother's counsel objected to mother being required to attend a sexual abuse awareness class. Mother had taken action after Elizabeth's disclosure and, even if it was true she had coerced Elizabeth to exaggerate the abuse, such a class might not address that issue. DCFS argued the classes would assist mother to deal with the issue in the future, observing she had not yet demonstrated the ability to do so. The court ordered the children removed from both parents. Mother was ordered to participate in joint counseling with the children (once their therapists deemed it appropriate to do so), to participate in parenting, sex abuse awareness and anger management courses and to undergo individual counseling. Mother filed this timely appeal.

---

[4]    As sustained and as pertinent here, the following counts state:
[a-1, b-2, and j-2] "On or about 05-07-19, . . . mother . . . physically abused [Isaac] by striking the child's back and body with [her] hand. Further, . . . Howard attempted to intervene by getting in-between the mother and [Isaac]. Such physical abuse was excessive and caused [Isaac] unreasonable pain and suffering. Such physical abuse of [Isaac] by the mother endangers the child's physical health, safety and well-being, creates a detrimental home environment and places [Isaac] and [his] siblings . . . at risk of serious physical harm, damage, and physical abuse."
      "b-1: On numerous prior occasions, . . . father . . . inappropriately and offensively touched [Elizabeth] over a multi[-]year period. Further, . . . mother . . . failed to take action to protect [Elizabeth] when the mother knew, or reasonably should have known of such inappropriate conduct on the part of father. Such abuse on the part of the father and the failure to protect on the part of the mother endangers the child's physical health and safety and places [Elizabeth] and [her] siblings . . . at risk of serious harm."
      Counts d-1 and j-1 were stricken.

# DISCUSSION

Mother raises two contentions on appeal. [5] First, she argues the record contains insufficient evidence to support the juvenile court's findings that the children were at risk by virtue of her physical abuse or father's sexual abuse of Elizabeth. Second, she insists the court abused its discretion by requiring her to participate in sexual abuse awareness counseling. Neither contention has merit.

## I. *The Standard of Review*

We review the juvenile court's jurisdiction findings and disposition order for substantial evidence. (*Kadence P., supra,* 241 Cal.App.5th at p. 1384.) Under this standard, our task is to assess the sufficiency of the evidence. Our power begins and ends with a determination as to whether substantial evidence, contradicted or not, supports the conclusion of the trier of fact. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379.) Appellant bears the burden to show "the evidence was not sufficient to support the findings and orders. [Citation.] The reviewing court may not reweigh the evidence or express an independent judgment. [Citation.]" (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446.) All evidentiary conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the decision, if possible. We may not reweigh or express an

---

[5] The record indicates mother appealed only from the jurisdictional findings. Nevertheless, we construe the notice broadly to also address her objection to a portion of the disposition order.

independent judgment on the evidence. (*I.J., supra,* 56 Cal.4th at p. 773; *Kadence P.* at p. 1384 ["We review the juvenile court's jurisdiction findings and disposition order for substantial evidence"].)

## II. *Applicable Statutes*
*Section 300, subdivision (a)*

Under section 300, subdivision (a), a juvenile court may exert dependency jurisdiction if a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent . . . . For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent . . . that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).)[6] Exposing a child to violence or placing the child in harm's way may trigger jurisdiction under this provision if there is evidence the violence will likely continue. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598–599 (*Giovanni F.*).) Subdivision (a) does not require that a parent direct his or her violence at the child (*In re M.M.* (2015) 240 Cal.App.4th 703, 719–720), because "[d]omestic violence [itself] is nonaccidental" (*Giovanni F., supra*, at p. 600).

---

[6] For purposes of this subdivision, "'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury." (§ 300, subd (a).)

19

Because this provision governs circumstances where there is a "substantial risk" of harm, there is no need to show that the child previously suffered harm by virtue of the violence. (*Giovanni F.,* at p. 598; see also *Kadence P., supra*, 241 Cal.App.4th at p. 1383 ["the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child"]; *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 [same].) Even if the child does not suffer physical harm, exposure to domestic violence may cause significant suffering. (*Ibid*.) The underlying rationale for this rule is that ""domestic violence in the same household where children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm . . . ."" [Citation.]" (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.)

*Section 300, subdivision (b)*

Under section 300, subdivision (b)(1), a juvenile court may assume jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." Again, the juvenile court "'need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*I.J., supra,* 56 Cal.4th at p. 773.) "'The purpose of dependency proceedings is to prevent risk, not ignore it.'" (*Jonathan L. v. Superior Court* (2008)

165 Cal.App.4th 1074, 1104.)  Section 300 requires only a "'substantial risk' that the child will be abused or neglected." (*I.J.*, at p. 773.)

*Section 300, subdivision (j)*

Under section 300, subdivision (j), a juvenile court may assume jurisdiction over a child where the child's sibling was abused or neglected, as defined in subdivisions (a), (b), (d), (e) or (i), and "'there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions.'" (*In re Rubisela E.* (2000) 85 Cal.App.4th 177, 197, disapproved on another ground by *I.J., supra*, 56 Cal.4th at p. 775.) When contemplating subdivision (j) jurisdiction, a juvenile court considers: "the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).) Subdivision (j) allows the court to take into consideration factors that might not be determinative if the court were adjudicating a petition filed directly under subdivisions (a), (b), (d), (e) or (i). (See *I.J.,* at p. 774.)

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In

such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*I.J., supra*, 56 Cal.4th at p. 773.)

III. *Substantial Evidence Supports the Juvenile Court's Assertion of Jurisdiction*

Here, ample evidence supports the juvenile court's finding that mother's physical abuse and attempt to use for her own purposes Elizabeth's revelation of father's sexual abuse placed the children at substantial risk of serious physical harm. The court found credible the children's evidence that mother hit, slapped, excessively spanked or threw things at the children on multiple occasions over the course of several years. Indeed, the incident that gave rise to the instant action involved physical violence so severe that Howard felt the need to place himself at risk of physical harm in order to protect his younger brother from mother. The record reflects ample evidence that the May 2019 incident was far from isolated. Mother had a significant and lengthy history of acts of physical violence. The court found the pattern of violence would likely continue, given mother's refusal to accept any responsibility for her conduct.

"[C]hildren are not to be hit with hard objects, especially to the point of leaving black and blue bruises." (*In re A.E.* (2008) 168 Cal.App.4th 1, 4.) A parent's deliberate, frequent corporal punishment of a child leaving bruises and a "cavalier indifference toward the infliction of physical pain" supports a finding of jurisdiction. (*In re*

22

*Benjamin D.* (1991) 227 Cal.App.3d 1464, 1472.) Mother does not deny that she "may have disciplined the children using a belt or sandal *in the past*." She implies that evidence she hit her children with belts and shoes is consistent with a reasonable level of discipline, and do not "remotely approach[]" the level of "serious physical harm" required to support the assertion of juvenile court jurisdiction. We disagree. We would be hard pressed to imagine a scenario under which repeated beatings of young children ages 15 or less, for transgressions as minor as forgetting to do a chore, and sometimes simply for the parent's own amusement, could be considered reasonable.

Mother does not actually claim there is insufficient evidence to support the court's finding that she engaged in inappropriate discipline against her children. Rather, she argues that the children were no longer at risk by the time of the jurisdictional hearing. A generous interpretation of mother's conduct is that she simply failed to recognize the risk her own conduct posed to her children. But one "cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) Mother ignores evidence that she was the perpetrator of incidents of physical assault against her children. Mother's claim that the children were not at risk of continued harm demonstrates a lack of understanding of the harsh impact her conduct posed for them.

The record contains substantial evidence to support the court's findings under section 300, subdivision (b). The evidence shows mother's violent behavior took root long before this case. The record

contains no evidence that mother was rehabilitated: she had not acknowledged, let alone begun to participate in the education or training she needs to ensure she can avoid engaging in such violence in the future. A parent's denial of wrongdoing or failure to recognize the negative impact of her conduct is relevant to determining risk under section 300. (See *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["'[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision'"].) Here, Mother consistently blamed all negative behaviors on the children or father, repeatedly refusing to accept any personal responsibility. Taken together, the facts provide sufficient support a conclusion that mother continues to pose a substantial risk of serious harm to her children, and that issue remained unresolved at the time of adjudication.

With respect to father's sexual abuse of Elizabeth, the decision in *I.J., supra*, 56 Cal.4th 766, is instructive. There, the Supreme Court held that evidence of a father's sexual abuse of his 14-year-old daughter justified assertion of jurisdiction over his other children, including those who were younger and of the opposite gender. *I.J.* explained that section 300, subdivision (j), expands the juvenile court's exercise of jurisdiction with regard to children whose sibling has been abused as defined by section 300, subdivisions (a), (b), (d), (e) or (i). Noting subdivision (j)'s broad language, the Court stated that "'the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in

subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.'" (*I.J.,* at p. 774.)

To determine if the risk is substantial, "'the court must consider both the likelihood that harm will occur and the magnitude of potential harm.'" (*I.J., supra*, 56 Cal.4th at p. 778.) "[T]he more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*Ibid*.)

Subdivision (j) is satisfied here. Father has admitted engaging in inappropriate, offensive touching of Elizabeth over a multi-year period. There is also evidence mother knew about or reasonably should have suspected father's abuse but did nothing to intervene or protect her child in contravention of her parental role, placing Elizabeth and her siblings at risk of serios harm. "Such misparenting is among the specific compelling circumstances which may justify state intervention, including an interruption of parental custody." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 77.)

Mother argues the allegation that she failed to protect Elizabeth from father should have been stricken because she told the authorities

immediately after Elizabeth revealed the sexual abuse to her. To the contrary, mother's actions have contributed to an increased risk to all of the children from father's actions. Although mother took some appropriate action, the court rightly recognized that the evidence showed she engaged in other conduct that increased her child's mental distress and also increased the risk of harm that all the children, not just Elizabeth, faced a risk of sex abuse by father in the future, thus necessitating juvenile court intervention. Elizabeth explained that mother consistently goaded her to exaggerate the extent of father's abuse. Mother was more focused on having father put in prison than on supporting, listening to and caring for Elizabeth. Mother's pressure and coaching in order to get father criminally punished increased Elizabeth's distress to the point she became "extremely conflicted, confused, and distraught." Eventually, the result of mother's actions caused Elizabeth to recant the more serious allegations, which decreased her credibility and led to father admitting only diminished allegations to establish jurisdiction against him.

Mother's pressure on Elizabeth to exaggerate also decreased her daughter's credibility to her siblings, none of whom believed father sexually abused Elizabeth. These three children have aligned themselves with father. They see no reason to believe they need to be on guard against father and are unlikely to accept a different narrative. Mother's action supported that narrative.

Viewing the record in totality, we find that substantial evidence supports a conclusion that mother's physical violence against her

26

children and her inability to either acknowledge the danger of her anger, let alone attempt to control it, has, in essence, left her children without a parent able to provide adequate care or supervision. Moreover, mother's self-serving conduct regarding Elizabeth's revelations of sexual abuse reflects a lack of concern about her children's well-being and emotional and physical safety.

IV. *The Record Supports the Dispositional Order Requiring Mother to Attend Sex Abuse Awareness Education*

In determining a case plan at disposition, "[t]he juvenile court may direct any reasonable orders to the parents . . . of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section . . . . That order may include a direction to participate in a counseling or education program . . . . The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (d).) No specific sustained count is required to permit the court to order a particular program as part of the parent's case plan. The juvenile court is not limited to the content of a sustained position in considering what dispositional orders are in child's best interests and may consider the evidence as a whole. (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311; *In re D.L.* (2018) 22 Cal.App.5th 1142, 1148 ["'The problem that the juvenile court seeks to address need not be described in the sustained section 300 petition. [Citation.] In fact,

there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order'"].) A proper dispositional order is one designed to address potential obstacles to family reunification. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 (*Christopher H.*).)

The juvenile court approved a case plan requiring mother to take a sex abuse awareness class. Absent a showing of a clear abuse of discretion—and there was none here—we will not disturb the court's exercise of discretion in fashioning an appropriate disposition order. (*In re Briana V., supra*, 236 Cal.App.4th at p. 311.) The question is whether a rational factfinder could conclude that the order was designed to advance the child's best interests. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186–187.) The juvenile court concluded that a counseling program teaching mother how best to engage with and support a child victim of sex abuse would be a service designed to address a potential obstacle to reunification. (See *Christopher H., supra*, 50 Cal.App.4th at p. 1006.) Further, a sex abuse awareness program could help equip mother to observe the signs of and protect her children from any such abuse in the future. For these reasons, the dispositional order requiring mother to participate in sex abuse awareness counseling was well within the juvenile court's discretion.

//

//

//

//

28

**DISPOSITION**

The jurisdictional findings and dispositional order are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.

We concur:


MANELLA, P. J.


COLLINS, J.